UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL H. HOLLAND, et al. as Trustees
of the UNITED MINE WORKERS OF
AMERICA 1992 BENEFIT PLAN,

       Plaintiffs/Counterclaim-Defendants,

           v.

ARCH COAL, INC.,

       Defendant/Counterclaim-Plaintiff.

Civil Action No. 17-00300 (CKK)

**DEFENDANT ARCH COAL'S REPLY TO PLAINTIFFS' OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

John R. Woodrum
D.C. Bar # 933457
OGLETREE, DEAKINS, NASH, SMOAK,
& STEWART
1909 K Street, N.W., Suite 1000
Washington, D.C.  20006
Telephone:  (202) 887-0855
Email:  john.woodrum@ogletree.com

W. Gregory Mott
D.C. Bar # 438200
OGLETREE, DEAKINS, NASH, SMOAK,
& STEWART
1909 K Street, N.W., Suite 1000
Washington, D.C.  20006
Telephone:  (202) 887-0855
Email:  gregory.mott@ogletree.com

*Attorneys for Defendant/Counterclaim-Plaintiff*

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................................1

ARGUMENT ................................................................................................................................2

    I.   The Purpose, Structure, History and Text of the Act Support Defendant's Position
        that the 1992 Plan May Not Require the Arch Related Person Group to Provide
        Double Security ....................................................................................................................2

        A.  The Purpose of Section 9712(d)(1)(B) is Not to Provide the Plan Double
            Security ........................................................................................................................3

        B.  The Structure of the Coal Act Does Not Support the Plan's Claim for Double
            Security ........................................................................................................................7

        C.  The Text of the Coal Act Does Not Support the Plan's Claim for Double
            Security ......................................................................................................................11

    II.  The Proceeds of the Fifth Third Bank Letter of Credit Provide a Windfall to the
        1992 Plan, Not to Arch ......................................................................................................16

    III. Arch Coal May Recover Excess Security for the Purpose of Providing Benefits to
        Coal Act Retirees Eligible for its Section 9711 Benefit Plan ...........................................18

CONCLUSION.............................................................................................................................19

# TABLE OF AUTHORITIES

## CASES

*A.T. Massey Coal Co. v. Barnhart,*
    381 F. Supp. 2d 469 (D. Md. 2005) ................................................................. 6, 14

*Brown v. Gardner,*
    513 U.S. 115 (1994) .......................................................................................... 13

*FDIC v. Meyer,*
    510 U.S. 471 (1994) .......................................................................................... 13

*Holland v. Bibeau Const. Co.,*
    774 F.3d 8 (D.C  Cir. 2014) ............................................................................... 11

*Holland v. New Era Coal Co.,*
    179 F.3d 397 (6th Cir. 1996) ............................................................................. 11

*Holland v. Williams Mountain Coal Co.,*
    256 F.3d 819 (D.C. Cir. 2001) ................................................................ 3, 4, 6, 12

*In re Montgomery Ward, LLC,*
    292 B.R. 49 (Bankr. D. Del. 2003) .................................................................... 12

*Kools v. Citibank*, N.A.,
    872 F. Supp. 67 (S.D.N.Y. 1995) ...................................................................... 12

*United States v. Estate of Romani,*
    523 U.S. 517 (1998) ............................................................................................ 6

## STATUTES

26 U.S.C  § 9701(a)(4) .............................................................................................. 9
26 U.S.C. § 9701(c) .................................................................................................. 9
26 U.S.C. § 9701(d)(1)(A) and (C) .......................................................................... 10
26 U.S.C. § 9704 ...................................................................................................... 11
26 U.S.C. § 9704(a) .................................................................................................. 9
26 U.S.C. § 9704(b)(2) ............................................................................................. 8
26 U.S.C. § 9705 ....................................................................................................... 8
26 U.S.C. § 9706 ....................................................................................................... 8
26 U.S.C. § 9711 ............................................................................................. 8, 10, 11
26 U.S.C. § 9711(c) ................................................................................................... 8
26 U.S.C. § 9712 ................................................................................................. passim
26 U.S.C. § 9712(a)(3) .......................................................................................... 6, 8
26 U.S.C. § 9712(d)(1)(A) and (C) ........................................................................... 2

26 U.S.C. § 9712(d)(1)(B) ................................................................................ passim
26 U.S.C. § 9712(d)(1)(C) .................................................................................... 9
26 U.S.C. § 9712(d)(1) .............................................................................. 9, 10, 13
26 U.S.C. § 9712(d)(1)(4) .................................................................................... 9
26 U.S.C. § 9712(d)(3) ....................................................................................... 10
26 U.S.C. § 9712(d)(4) ....................................................................... 2, 11, 13, 14
26 U.S.C. § 9712(d)(6) ......................................................................................... 9
26 U.S.C. § 9713 .................................................................................................. 9
30 U.S.C. §1201et seq.......................................................................................... 14

## REGULATIONS

30 C.F.R. § 800.12 ............................................................................................... 15
30 C.F.R. § 800.50(b) ........................................................................................... 6

## OTHER AUTHORITIES

U.C.C. Article 5, §§ 5-101 to 5-117 (Letters of Credit) ..................................... 12

*Massanari v. Sigmon Coal Co., Inc.*,
   2001 WL 845545 (U.S.), 3 (U.S. Amicus Brief, 2001) ....................................... 11,13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL H. HOLLAND, et al. as Trustees
of the UNITED MINE WORKERS OF
AMERICA 1992 BENEFIT PLAN,

    Plaintiffs/Counterclaim Defendants,

        v.

ARCH COAL, INC.,

    Defendant/Counterclaim-Plaintiff.

Civil Action No. 17-00300 (CKK)

## DEFENDANT ARCH COAL'S REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

This is a case of first impression.  There are no disputed material facts.[1]  The issue is how the facts are characterized for purposes of demonstrating compliance with Section 9712(d)(1)(B) of Coal Industry Retiree Health Benefit Act ("Coal Act" or "Act"), 26 U.S.C. § 9712(d)(1)(B).  That Section requires "1988 last signatory operators" to provide security to the UMWA 1992 Benefit Plan ("1992 Plan" or "Plan").  The purpose of the security is to protect against the possibility that the 1992 Plan might eventually have to provide health care coverage to coal mine retirees (and their dependents) that Section 9711 of the Act mandates a 1988 last signatory operator (and its "related persons") provide.  The case presents three discrete questions.

1. Does the first sentence of Section 9712(d)(4), which imposes joint and several liability on a Coal Act related person for payments that a 1988 last signatory operator is required to make

---

[1] Plaintiffs' opposition pleadings include a "Response" to Arch Coal's statement of uncontested material facts.  Plaintiffs' "Response" contains 42 additional paragraphs labeled "Additional Facts Relevant to [Arch Coal's] Motion for Summary Judgment."  ECF No. 21-1, at 7-13.  Because these additional paragraphs are comprised of statements that are virtually identical to the previously alleged undisputed "facts" filed in support of Plaintiffs' summary judgment motion, see ECF No. 19-2, Defendant hereby incorporates its initial responses admitting and/or disputing each such paragraph and statement.  See ECF No. 22-1.

to the 1992 Plan pursuant to Section 9712(d)(1)(A) and (C), also encompass a 1988 last signatory operator's obligation under subparagraph (B) to provide security to the 1992 Plan?

2. If a related person is jointly and severally liable for a 1988 last signatory operator's security obligation, was that obligation satisfied in this case where (i) security compliant with Section 9712(d)(1)(B) was provided to the 1992 Plan with respect to the Arch Related Person Group and that security was never withdrawn or cancelled, (ii) the Arch Related Person Group has never failed to provide health benefits to the Section 9711 retirees for whom the security was provided, and (iii) the 1992 Plan has never enrolled or provided benefits to any Arch retiree eligible for benefits under Section 9711?

3. If the Court determines that Plaintiffs currently hold security for the Arch retirees that exceeds the amount required for 2017, may the 1992 Plan retain the excess for its own use, or must the Plan convey the excess to the sponsor or plan administrator of the Section 9711 health plan Arch Coal maintains for its Coal Act retirees and their dependents?

## ARGUMENT

**I.    The Purpose, Structure, History and Text of the Act Support Defendant's Position that the 1992 Plan May Not Require the Arch Related Person Group to Provide Double Security**

Plaintiffs' have never actually addressed Arch Coal's argument that, if 1988 last signatory operators and their related persons are jointly and severally responsible for posting security, what is the legal basis for the 1992 Plan's claim that the Coal Act authorizes the Trustees to compel Arch to provide security all over again for the same retirees for whom the Arch Related Person Group previously provided security?  This is both curious and inexplicable. Plaintiffs' response seems to consist of an acknowledgement that, although the Plan does have $8,608,392 that *used* to be security, they don't call it that any more.  Thus, the 1992 Plan intends

to ride its horse named "We Have No Security" to the finish line, at which time it proposes to collect an $8.6 million purse, *and* a new $8.3 million horse named "We Have Security".

Plaintiffs say the text, structure, history and purpose of the Coal Act require this outcome. Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 1, 4 (hereafter, "Pls' Opp. Mem. at __"), ECF No. 21.  As set forth in Defendant's brief in support of its Motion for Summary Judgment (hereafter, "Def's S.J. Brief at _"), ECF No. 20-1, and amplified below, the bizarre outcome advocated by the 1992 Plan could not be further from the Act's text, structure, history and purpose.  *See Holland v. Williams Mountain Coal Co.*, 256 F.3d 819, 823-24 (D.C. Cir. 2001). [2]

### A.    The Purpose of Section 9712(d)(1)(B) is Not to Provide the Plan Double Security

We start with the "purpose" of the Coal Act's security requirement because there seems to be no room to dispute Congress' intention with respect to this provision.  Indeed, the statutory language leaves no space to quibble about its purpose.

> The provision of a security (in the form of a bond, letter of credit or cash escrow) in an amount equal to a portion of the projected future cost to the 1992 Plan *of providing health benefits for eligible and potentially eligible beneficiaries attributable to the 1988 last signatory operator.*

---

[2]   The Plan notes that Arch changed its position on whether a related person is required to post security, because Arch did so for 10 years, and did not previously claim its action was voluntary.  Arch's prior history in this regard is consistent with the reality that corporate parents typically are in the best position to provide for surety bonds and letters of credit for their wholly owned subsidiaries.   Thus, Arch would have arranged for the required bond/letter of credit for its subsidiaries whether voluntary or mandatory, so long as there existed unified ownership.  It was not until the 1992 Plan made a demand for duplicate security that there was even a reason to address the extent of a related person's obligation under Section 9712(d)(4) to stand good for the Coal Act obligations of its *former* subsidiaries.  Section 9711(c) clearly requires a related person to assume even a *former* subsidiary's Section 9711 obligation to maintain a benefit plan, which Arch has done.  However, as explained further herein Section 9712(d)(4) does not require a related person to stand good for a former subsidiary's security obligation (especially where the required security had already been provided to the Plan).

26 U.S.C. § 9712(d)(1)(B) (emphasis added).

It takes a contortionist to turn this clear and unambiguous expression of purpose into something other than a bonding program to provide financial assurance. Specifically, if the entities responsible for providing continuing health care coverage to their Coal Act retirees pursuant to Section 9711's mandate default on their statutory obligation, then the required "security" is paid to the 1992 Plan. It provides a stop gap, one-year's worth of estimated health benefits "for eligible and potentially eligible beneficiaries attributable *to the 1988 last signatory operator*" who are newly orphaned due to the operator's demise. Indeed, Plaintiffs acknowledge this purpose.[3]

The purpose of Coal Act "security" is not to provide the 1992 Plan with a general revenue source, a windfall, or funding to provide benefits to other orphaned coal retirees --i.e., eligible and potentially eligible beneficiaries "attributable" to *other* 1988 last signatory operators. As the D.C. Circuit noted in 2001 in another Section 9712 statutory construction case, no 1992 Plan retiree will go without benefits. *Williams Mountain*, 256 F.3d at 823 ("The… miners will receive benefits regardless of whether defendants are billed for them"). *See also infra* at 6. Moreover, the Coal Act does not erect pool bonding; it established operator-specific performance bonding. The fact Section 9712(d)(1)(B) calibrates the amount of security required of each 1988 last signatory operator to *that operator's beneficiaries* who are potentially eligible to receive benefits from the 1992 Plan underscores that Coal Act "security" in Section 9712 is not a penalty or contribution to the Plan for the general welfare of all orphaned, Plan-eligible, coal mine

---

[3]   *See, e.g.,* Complaint ¶ 11, ECF No. 1 (noting purpose of security is to protect Plan "against the event that [Arch] may fail or cease to provide the requisite benefits under Section 9711 of the Coal Act…, or against the event that beneficiaries attributable to [Arch under Section 9711] must be enrolled to receive their benefits from the 1992 Plan."); Pls' Opp. Mem. at 11 (1992 Plan "provides benefits to retirees whose former employers have failed in their obligation to provide health care benefits through [Section 9711 Individual Employer Plans].")

retirees.   The 1992 Plan necessarily recognizes this specific and narrowly-tailored purpose, because it developed procedures for trimming any security instrument in excess of the amount the Plan estimates it would need to provide health care coverage to *that 1988 signatory operator's beneficiaries* for the stop gap year should they become orphaned by their former employer (and its related persons).

This notwithstanding, Plaintiffs boldly assert that "nothing in the Coal Act restricts the use of proceeds from a called security to specific 1992 Plan beneficiaries."  Pls' Opp. Mem. at 13.  In view of the precise and carefully-calibrated statutory language set forth above, however, it is a head scratching and inequitable claim that funds obtained from a performance bond, such as the Fifth Third Bank letter of credit, "are now [just] assets of the 1992 Plan," Pls' Opp. Mem. at 13, for use in defraying health care expenses incurred by orphaned coal miners who never worked for the Arch Related Person Group.

The 1992 Plan dismisses the Coal Act's precise calibration of each former employer's required security to its eligible and potentially eligible coal retirees with a cursory throwaway: "the *amount* of the required security is measured by the number of actual and potential beneficiaries attributable to the relevant 1988 last signatory operator, but that's as far as it goes." Pls' Opp. Mem. at 14.  (emphasis in original).  Plaintiffs offer no textural analysis or even isolated legislative remarks in support of their casual disregard of the actual text of Section 9712(d)(1)(B).  Their defense rests on the assertion that, if the drafters had really meant what they wrote, they presumably would have said security was to offset a portion of the cost to the Plan of providing health benefits for eligible and potentially eligible beneficiaries attributable to the 1988 last signatory operator, *and for no other purpose*.  Where the language is clear, it is not incumbent on Congress to double down in this manner.  When language permits no other reasonable interpretation, no rule of construction discounts clarity because one could imagine

phrasing that would have expressed the directive even more clearly. *A.T. Massey Coal Co. v. Barnhart*, 381 F. Supp. 2d 469, 482 (D. Md. 2005), *aff'd sub nom. A.T. Massey Coal Co. v. Holland*, 472 F.3d 148 (4th Cir. 2006) ("If the words convey clear meaning courts do not sift secondary indices to discover alternative meanings.")

In the absence of actual support for their argument, Plaintiffs seek to deflect attention from the statutory language by switching to ERISA provisions that speak of general fiduciary duties imposed on the Trustees of the 1992 Plan (and all employee benefit plans), claiming that "[t]hose fiduciary obligations alone dictate how the proceeds from the Patriot letter of credit must be spent." Pls' Opp. Mem. at 14. This redirection merely avoids the real question, which is the directive Congress gave the Trustees in Section 9712(d)(1)(B) concerning how Coal Act security is to be used. *United States v. Estate of Romani*, 523 U.S. 517, 532 (1998) (later more specific statute governs).

In Section 9712(a)(3), Congress provided a specific and dedicated funding source for the 1992 Plan that ensured the Plan would always receive funding commensurate with the full cost of providing benefits for beneficiaries of defunct last signatory operators who receive their healthcare from the Plan. This self-contained funding system means that Congress did not incentivize the Trustees to take aggressive collection or revenue generating positions to garner resources to avoid benefit cuts. *Williams Mountain*, 256 F.3d at 823. Labeling the Fifth Third Bank letter of credit proceeds as a "Plan asset" where Arch (not the 1992 Plan) is providing benefits to the Arch retirees is not envisioned much less permitted by the Coal Act. Those proceeds cannot become an asset of the Plan unless the Plan is required to deliver benefits to the Arch Section 9711 retirees for whom the security was provided in the first instance.[4] No broad

---

[4] This is precisely the result mandated under the Interior Department's nationwide bonding program for coal mine reclamation. This governmental program, which preexisted the passage of the Coal Act in October 1992, has long required "financial assurance" through the

fiduciary obligation requires (or even supports) the Trustees' position that they must use the proceeds of the Arch Related Person Group's security to pay for the benefits of retirees and dependents of defunct employers and related persons.[5]

## B. The Structure of the Coal Act Does Not Support the Plan's Claim for Double Security

Plaintiffs' principal argument that the structure of the Coal Act requires Arch to provide security that was previously posted to the 1992 Plan rests on the premise that related persons are responsible for all obligations imposed on signatory operators. But we know this is not the structure of the Act, because it would have been much simpler to have established that in a single sentence. That is, Congress could have succinctly stated that "a related person is jointly and severally responsible for all obligations imposed on a signatory operator." Instead, the Act imposes various types of obligations on specified employers (i.e., "signatory operators"), and

---

posting of performance bonds --e.g., letters of credit and surety bonds-- that mine reclamation will be completed even were a permittee/coal operator to default on its continuing reclamation obligations due to its demise in bankruptcy. *See, e.g.*, 30 C.F.R. § 800.50(b) (directing program administrators "in the event of forfeiture" to "collect the bond . . . [and] use the funds collected from bond forfeiture to complete the reclamation plan . . . on the permitted area . . . to which the bond applied.").

[5] In the course of defending their conversion of the Fifth Third Bank letter of credit to cash (an action Arch Coal does not challenge), Plaintiffs state: "It doesn't matter that the Arch Retirees never were enrolled in the 1992 Plan because that wasn't the trigger for the 1992 Plan to draw on the letter of credit." Pls' Opp. Mem. at 15. This highlights the flaw in the Plaintiffs' claim in this case. While it may not have violated the terms of the letter of credit for the Plan to initiate a protective draw down once Patriot ceased to provide benefits for the 1988 last signatory operators' Coal Act retirees, that event only provided a basis for the conversion of the letter of credit to cash security. The Act does not authorize those proceeds to become "Plan assets" unless and until the Plan actually provides benefits to the Arch retirees. Plaintiffs never recognize or acknowledge the critical distinction between their unilateral act of converting the letter of credit to cash security, and the separate but necessary act of using the proceeds for the statutory purpose (providing benefits) for which the security was given. Perhaps the Plan's failure to connect the conversion to cash with the provision of benefits is because in all other cases involving the forfeiture of security the Plan did enroll and provide benefits to the last signatory operators' Section 9711 retirees. In any event, that is not what happened here and the Plan's claim that the proceeds are now just "Plan assets" is wrong as a matter of fact and law.

specifies in different statutory sections those obligations for which a related person is jointly and severally responsible.  Thus, in each case it is necessary to analyze the actual statutory language to ascertain a signatory operator's obligations and a related person's obligations.

In this regard it is important to note that the Act secures lifetime healthcare benefits for three discrete groups of UMWA retirees, but does so in very different ways.  For example, for those coal retirees who are in the UMWA Combined Benefit Fund ("Combined Fund"), premium responsibility is allocated to a former operator who employed the miner in accordance with a multi-tiered work history formula, 26 U.S.C. § 9706, and the annual premium is set by the Commissioner of Social Security and adjusted in accordance with upticks in a particular Consumer Price Index – – not based on actual health care expenditures.  26 U.S.C. § 9704(b)(2). Significant Federal subsidies are mandated to cover all orphaned coal miners receiving health benefit from the Combined Fund, as well as the differential between an assigned operator's per beneficiary premium and the actual cost of providing the benefits.  26 U.S.C. § 9705.

With respect to Coal Act retirees who were receiving health care benefits from their former coal employer's Individual Employer Plan in 1992, the Act compels their last signatory operator to continue their health care coverage by providing substantially the same level of benefits with no Federal subsidies.  26 U.S.C. § 9711(c).

The 1992 Plan was created as an orphan health plan to backstop coal retirees who would otherwise lose coverage should their responsible former employer (and its related persons) default on their statutory obligation under Section 9711 to provide continuing health care coverage.  Originally, Federal funds were not available for these retirees, and health coverage for all orphaned coal retirees enrolled in the 1992 Plan was financed by statutory premiums collected from "1988 last signatory operators" (as opposed to all "last signatory operators").   The 2006 amendment to the Coal Act, however, specifically provides ongoing Federal subsidies for 1992

8

Plan orphans, 26 U.S.C. § 9712(a)(3), while retaining a potential statutory "backstop premium" payable by 1988 last signatory operators should the Federal subsidy be insufficient to cover all orphan healthcare costs.  *See* Pub. Law No. 109-432, 120 Stat 2922 (2006) (codified at 26 U.S.C. § 9712(d)(1)(C).)

In short, each subchapter of the Coal Act addressed a discrete group of pre-1994 coal retirees, and utilized different funding concepts for each.  These different financing arrangements resulted in different definitions for categories of operators (*e.g.*, "signatory operator", "1988 agreement operator", "last signatory operator", "assigned operator", "1988 last signatory operator").  *See* 26 U.S.C. § 9701(c), § 9712(d)(6).  As Arch pointed out in its opening summary judgment brief, Deft's S.J. Brief at 5 n.2, 12, ECF 20-1, financing for the 1992 Plan was unique because (initially) the burden fell exclusively on the subset of operators that were signatory to a labor agreement at the time of enactment (*i.e.*, the "1988 last signatory operators").  Moreover, as late as two days prior to final Senate passage of the bill that was codified without change in October 1992, the drafters had not even prepared the text of the provision (codified as Section 9712) that would establish the Coal Act's 1992 Plan. Deft's S.J. Brief at 3-4, ECF 20 (citing *Massanari v. Sigmon Coal Co.*, *Inc.*, 2001 WL 845545 *37A (U.S.), 3 (U.S. Amicus Brief, 2001)).  *See also* 26 U.S.C.A. § 9701(a)(4) & editor's note (defining "1992 UMWA Benefit Plan" [with an erroneous cross reference to a Coal Act section (26 U.S.C. § 9713) that does not exist], as that same term was defined in the Senate Legislative Counsel's draft referenced above).

Against this backdrop, Plaintiffs suggest that the phrase "any amount required to be paid by [a 1988 last signatory operator]" in Section 9712(d)(1)(4) must encompass a 1988 last signatory operator's statutory obligation to provide security --not just the payment of 1992 Plan premiums-- because in Section 9704(a) the drafters used the word "premium".  They suggest that if the drafters had intended for a related person's financing obligation in Section 9712(d)(1) to

extend only to payment of premiums, the drafters would have said "premiums." But Plaintiffs place too much weight on this difference in wording.

First, this reading requires the reader to suspend application of Act's plain language and equate posting a Coal Act health coverage performance bond with making a payment to the 1992 Plan. Moreover, it ignores the fact that the reference to "amount required to be paid by [a 1988 last signatory operator]" in 9712(d)(4) echoes the twin premium financing requirements, *see* 26 U.S.C. § 9701(d)(1)(A) and (C), which legislate "payment . . . by each 1988 last signatory operator." In contrast, the security requirement, 26 U.S.C. § 9712(d)(1)(B), uses the word "provide" but not the word "payment". Thus, the fact that the drafters *could* have used the word "premium" in (d)(4) in no way undercuts the plain and commonsense meaning of the phrase the drafters did use.

Second, as noted above, Section 9712 of the Act established the backstop 1992 Plan, which was evidently drafted hurriedly at the tail end of the legislative process, and likely without any consideration of the very different structure and liability arrangements devised for the Combined Fund, which immediately enrolled in excess of 100,000 coal industry retirees. As the Court observed in *Sigmon Coal*, the question in this case is what liability Congress in fact imposed and on whom.

Section 9712 imposes 1992 Plan liability in a very different manner and on very different parties than Sections 9702-9708 (Combined Fund) and Section 9711 (last signatory operators). For example, Section 9712(d)(3) provides that last signatory operators are required to pay a premium to the 1992 Plan for each retired employee attributable to them who receives benefits from the 1992 Plan. However, Section 9712(d)(1) provides that only employers signatory to a 1988 coal wage agreement are required to pay backstop premiums to the 1992 Plan. That section also provides that only 1988 last signatory operators must provide security, even though all last

signatory operators are required to provide health benefits under Section 9711, and pay the per beneficiary premiums required by 9712(d)(1)(A).

In the context of controversial legislation such as the Coal Act, the proper focus is on whether the meaning of the provision under consideration is clear, not what is provided in a separate subchapter of the legislation.  Indeed, the better comparison in this case would be to the language in Section 9721, which also was a last-minute addition to the Bill that was enacted without change.  *Sigmon Coal* 2001 WL 845545 *37A (no civil enforcement section included). Section 9721 refers to "an obligation to pay any amount" repeatedly, which suggests that the eleventh-hour drafters were more likely focused on parallelism with Section 9721, which was codified as the next section of the Coal Act immediately after 9712, than with a reference to "premiums" in Section 9704.  *Holland v. New Era Coal Co.*, 179 F.3d 397, 401 (6th Cir. 1996) ("If a liable signatory signatory operator does not *pay* its proportional beneficiary *premiums*, liability is shifted jointly and severally to any related person to the operator.") (emphasis added); *Holland v. Bibeau Const. Co*., 774 F.3d 8, 11 & 14 (D.C Cir. 2014) ("If a signatory operator has gone out of business, then a 'related person' is jointly and severally liable for premiums.") ("the responsibility of the employer (or any 'related person' is to 'make [Plan] contributions' . . . as they become due each month."); *Williams Mountain*, 236 F.3d at 823 (purpose of the Act was "to assign the duty of paying premiums to persons most responsible for plan liabilities").

## C.    The Text of the Coal Act Does Not Support the Plan's Claim for Double Security

Defendant submits that the Section 9712(d)(1)(B) requirement that a 1988 last signatory operator post a health coverage performance bond to the 1992 Plan (i.e., "*provide security*") is not synonymous with the Section 9712(d)(4) requirement that a related person is liable for any amount a 1988 last signatory operator is required to pay to the Plan.  Plaintiffs' arguments to the contrary are easily rebutted.

11

1.      The Plan cites cases arising under the Uniform Commercial Code such as *In re Montgomery Ward, LLC,* 292 B.R. 49 (Bankr. D. Del. 2003), and "UCB" decisional law, *Kools v. Citibank*, N.A., 872 F. Supp. 67 (S.D.N.Y. 1995), for the proposition that a letter of credit is a mode of payment for debt.  It may well be that in certain commercial "goods" transactions, especially involving foreign buyers and sellers, a buyer can utilize a letter of credit to pay for merchandise under Article 5 of the UCC (or Article 2 of the "UCB") and thereby alleviate the risk of having to pay before receiving the goods.  In such situations the buyer deposits the purchase price with the issuing bank and the seller draws down the letter of credit a short time later as payment for the merchandise.  *Kools*, 872 F.Supp. at 68-69.  However, that is distinctly not the situation presented to the 102nd Congress in shaping the Coal Act's security requirement in Section 9712.  The Fifth Third Bank letter of credit was not provided as a method for paying the 1988 last signatory operators' accrued healthcare premiums for delivered or soon-to-be delivered health care services.  Rather, Coal Act letters of credit provided by financial institutions are a contingent health care coverage performance bond --i.e., security and financial assurance should 1988 last signatory operators (as well as their successors-in-interest, post-enactment transferees, and pre-enactment related companies) collectively *fail* to provide the coverage statutorily mandated by Section 9711. *Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context.").

2.      The Plan suggests that security and the backstop premium are two sides of the same coin and must be treated the same because both are contingent obligations.  Pls' Opp. Mem. at 8, n.4.  While the backstop premium may be contingent now, that was not the case when the Coal Act was enacted in 1992.  Prior to 2007, 1988 last signatory operators were required to pay an annual pre-funding premium to cover the cost to the Plan of providing benefits to orphans (after the defunct 1988 last signatory operator's security was exhausted).  Therefore, the fact the

2006 amendments converted the mandatory prefunding premium to a contingent backstop premium some 14 years later provides no interpretive guidance here.

3.      Plaintiffs note that Section 9712(d)(1) characterizes the two premium obligations *and* the security obligation set forth in subparagraphs (A)-(C) as "financing requirements".  They invoke dictionary definitions in an effort to equate "finance" in 9712(d)(1) with "pay" in Section 9712(d)(4).  Pls' Opp. Mem. at 10.  Not only is this a strained comparison, it ignores Black's Law Dictionary – – the "go to" legal dictionary for decades.  *See, e.g., FDIC v. Meyer*, 510 U.S. 471, 474 (1994) (applying Black's sixth edition to resolve a statutory construction dispute regarding the meaning of the undefined term "cognizable").  Black's sixth edition, published two years prior to enactment, provides much more comprehensive and nuanced meanings for these terms.  As regards the obligations at issue here, the most applicable example of a "payment" is:  "In a more restricted legal sense payment is the … discharge of a debt or liability, by the delivery of money or other value by a debtor to a creditor, where the money or other valuable thing is tendered and accepted as extinguishing debt or obligation in whole or in part."  (Relevant portion appended as Exhibit 1)  In other words, the common underpinning for "payment" is the existence of a debt or obligation that the payment extinguishes.  While that clearly encompasses an obligation to pay premiums mandated by statute, the provision of security cannot be viewed as payment of a debt owed to the 1992 Plan by a 1988 last signatory operator.

In contrast, the provision of security is not defined to be the payment of a debt or obligation.  Although Black's provides several possible definitions for the word "security" the one closest to its use in Section 9712(d)(1)(B) is:  "Protection; assurance; indemnification."  Thus, "security" is provided to "furnish[ ] the creditor with a resource to be used in case of failure in the principal obligation."  (Relevant portion appended as Exhibit 2)

This characterization of security finds support in contemporaneous regulations governing coal operators' performance bonding for their coal mine reclamation obligations under the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201 et seq. ("SMCRA"), a coal mine environmental liability statute repeatedly referenced in the 1992 Coal Act and the 2006 amendments.  It is reasonable to assume Congress was aware of this bonding practice when considering the security provision embodied in Section 9712(d)(1) of the Coal Act.  *A.T. Ma*ssey, 381 F.Supp.2d at 481 ("In appropriate circumstances courts presume Congress was aware of facts and practices in place at the time the statute was enacted.") (construing the undefined term "reimbursement" in Section 9704).

4.      The 1992 Plan argues that since related person liability under Section 9712(d)(4) extends to "any amount required to be paid by [the 1988 last signatory operator]", that includes payments to a financial institution, a surety company, or an escrow agent.  Pls' Opp. Mem. at 7, ECF No. 21.  There are several flaws with this argument.  First, the Plan fails to quote the entire phrase, which ends with "under this section."   Only two amounts are required to be paid by a 1988 last signatory operator under this section and they are (i) "[t]he payment of a monthly per beneficiary premium" per subparagraph (d)(1)(A), and (ii) "the payment of an additional backstop premium" per subparagraph (d)(1)(C).  "This section" does not encompass a payment to a surety for good reason.  In many cases a coal company maintains an existing line of credit or bond with a surety or financial institution to cover a range of obligations which are subject to performance bonds or a security requirement, not the least of which is performance of reclamation obligations imposed by SMCRA.  *See, e.g.,* 30 C.F.R. § 800.12 (identifying "surety bonds" and "collateral bonds" which commonly include letters of credit, cash, securities, and CDs, as acceptable SMCRA reclamation bonds).  Bonds and letters of credit are typically secured by a pledge of corporate assets, so adding an additional amount to be securitized (such as

Coal Act obligations) may or may not require an additional payment. Thus, a surety company or financial institution's issuance of a one-year health coverage performance bond under Section 9712 does not necessarily trigger an amount the applicant is required to pay to the surety.

Second, a surety will have its own commercial arrangement with the entity that arranges for the performance bond or letter of credit. *See, e.g.*, osmre.gov/resources/bonds/bondsoverview (discussing various arrangements between coal operators and financial institutions relating to letters of credit and premiums paid for credit). A surety company or financial institution does not need to rely on Coal Act related person liability under Section 9712(d)(4) to obtain its fees or, as appropriate, obtain collateral to alleviate risk of applicant nonperformance. Indeed, it is implausible to suggest that a surety could bring a cause of action under Section 9712(d)1)(B) to collect from a related person a fee owed by a 1988 last signatory operator.

Third, the Plan finds significance in the fact this phrase is not further limited by the words "to the 1992 Plan." *See* Pls' Opp. Memo. at 7, ECF No. 21. But any natural reading of Sections 9712(d)(1)(B) and (d)(4) leads to the inevitable conclusion that the required financing provisions are imposed for the benefit of the 1992 Plan, not for the benefit of some third-party surety that may have a contractual relationship with a coal operator. Adding the words "to the 1992 Plan" would merely state the obvious and would qualify for the "Department of Redundancy Department" award.

5. The 1992 Plan points out that the second sentence in paragraph (d)(4) –which was added by a 2006 amendment to the Coal Act —uses the word "premium" rather than "amount to be paid." This newly added sentence does not support the statutory construction argument advanced by Plaintiffs, however, because the added sentence is speaking exclusively about a method by which a parent company that qualifies under Section 9704(j)(2) of the Act can elect to "buy out" its signatory subsidiaries' Section 9711 and Section 9712 Coal Act liability, and

concentrate their Coal Act benefit and premium obligations at the parent level.  However, Section 9711(c)(3)(B) specifies that this new security is in addition to any other security required by the Act.  In short, since the subject of the second sentence of the joint and several liability provision in Section 9712(d)(4) is the new security option added in 2006, the reference to premiums was necessary to ensure that there was no conflict with the specific provision in new Section 9711(c)(3)(B) that the security required by Section 9712(d)(1)(B) was not affected by the buyout.

**II.     The Proceeds of the Fifth Third Bank Letter of Credit Provide a Windfall to the 1992 Plan, Not to Arch**

Plaintiffs assert that Arch's position concerning the proceeds of the Fifth Third Bank letter of credit is "absurd" because "Arch is not entitled to an $8.6 million windfall."  Pls' Opp. Mem. at 13.  They apparently see no irony in the fact that their own position would result in the 1992 Plan receiving $8.6 million for doing absolutely nothing, because the Plan has not expended the first dollar to provide benefits for the very Arch retirees for whom the letter of credit was posted in the first place.  And the Plan converted the letter of credit into cash with full knowledge that Arch would enroll its 1988 last signatory operators' Coal Act retirees in an Arch-sponsored Section 9711 benefit plan.  It is hard to articulate a better example of a "windfall", especially when the Plaintiffs' position would require Arch to put up new security in the amount of $8.3 million.  If that is not a windfall then it is certainly a tidy profit for no work.  Indeed, the 1992 Plan's repeated protestations that "we have no security" because the $8.6 million is now an asset is reminiscent of an account holder whose bank mistakenly credits $8.6 million to his account, and claims the proceeds cannot be returned because they were converted to a certificate of deposit and the account is now closed.

Plaintiffs' position on the equities in this case is premised largely on the fact that Arch was not a party to the Fifth Third Bank letter of credit.  While it is true that Arch was not a direct

party, it is misleading to suggest that Arch was a stranger to Patriot's arranging for the letter of credit, and it is manifestly incorrect to suggest that Defendant's position in this case would result in a windfall for Arch.   First, the record amply demonstrates that, from the outset, Arch's position has been that the Plan has compliant security from the proceeds of the letter of credit -- not that Arch is entitled to the proceeds.

Second, Arch is not a stranger to the security requirement.   As the Plan acknowledges, Arch itself arranged for the provision of security required by its subsidiaries until it sold the 1988 last signatory operators to Magnum Coal at the end of 2005.   A condition of that sale was that the buyer would assume the Arch Related Person Group's Coal Act obligations, including the provision of security.   Thus, the fact the Plan had security from Fifth Third Bank is because Magnum was subject to a contractual obligation to post it, and Patriot succeeded to that obligation when it acquired Magnum.   It is, therefore, a misnomer to say that Arch is a stranger to Patriot's provision of security to the 1992 Plan.

Third, the course of events here provides no support for a claim that Arch would receive a windfall under any possible outcome in this case.   It is self-evident that by requiring Magnum to assume responsibility for the acquired companies' Coal Act obligations, the price Arch received was greatly discounted.   But, in return for accepting a lower price, Arch was relieved from the going-forward annual cost of its 1988 last signatory operators' Coal Act obligations. While this may have resulted in a fairly valued business transaction for Arch and Magnum at the time, Patriot's subsequent failure and liquidation in bankruptcy made it significantly less so for Arch.   Using the 1992 Plan's own calculations, Arch has had to re-assume a statutory annual healthcare obligation in the range of $8.3 million a year that it would not have now but for the unfortunate failure of the Patriot Coal organization.   Arch did not get the benefit of its bargain in 2005, and must now absorb this unexpected and unwelcome new financial burden.   Moreover,

17

Arch is now confronted with the Plan's claim that it must also provide $8.3 million to secure a Coal Act obligation that was taken into account in the price Magnum paid for the 1988 last signatory operators it acquired in December 2005.

For these and other reasons, the "windfall" mantra Plaintiffs have directed at Arch Coal is very much misplaced.  It is more appropriately aimed at the 1992 Plan. Arch stepped in to timely honor the Coal Act consequences of Patriot's bankruptcy, promptly assuming the obligation to provide health benefits to its 1988 last signatory operators' retirees and dependents.  This Court should require the Trustees of the 1992 Plan to also honor the intent and wording of the Act, and accord the identifiable proceeds of the Fifth Third Bank letter of credit the status of security, which it is.

### III.   Arch Coal May Recover Excess Security for the Purpose of Providing Benefits to Coal Act Retirees Eligible for its Section 9711 Benefit Plan

As for Defendant's request that any excess security be used to offset the estimated $8.3 million in annual healthcare costs Arch currently shoulders as a consequence of Patriot bankruptcy, that request is completely consistent with the Congressional purpose for providing security in the first instance.  It is also consistent with the Plan's own internal process for adjusting the amount of security it holds to comport with the projected cost to the Plan of providing a year of benefits.  Arch asks for nothing more than the same treatment the 1992 Plan accords all 1988 last signatory operators and related persons.

The excess security appears to be around $500,000.  It cannot be said that applying that amount to an annual $8.3 million Coal Act retiree healthcare cost that Arch has absorbed since 2016 constitutes a windfall for Arch.  This is especially true when the Plan acknowledges that it has no intention of using those funds to offset healthcare costs for the Arch retirees, and the Act does not permit the Trustees to use it for any other purpose.

## CONCLUSION

Plaintiffs' Complaint for the provision of security should be dismissed, and the Plan should be directed to provide Arch Coal the proceeds from the Fifth Third Bank letter of credit that exceeds the amount of security the Plan requires for 2017, to be used exclusively for the purpose of providing benefits to participants in Arch Coal's Section 9711 health plan.

Date:  October 4, 2017             Respectfully submitted,

_____/s/_____
John R. Woodrum, D.C. Bar # 933457
W. Gregory Mott, D.C. Bar # 438200
OGLETREE, DEAKINS, NASH, SMOAK,
   & STEWART
1909 K Street, N.W., Suite 1000
Washington, D.C. 20006
Telephone: (202) 887-0855
Email:  john.woodrum@ogletree.com
Email:  gregory.mott@ogletree.com

*Counsel for Defendant Arch Coal, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on October 4, 2017, a true and correct copy of the foregoing Reply in Support of Motion for Summary Judgment was served via CM/ECF upon the following:

Barbara E. Locklin
Larry D. Newsome
UMWA Health & Retirement Funds
Office of the General Counsel
2121 K Street, N.W., Suite 350
Washington, D.C.  20037
Telephone:  (202) 521-2238
Email:  blocklin@umwafunds.org
Email:  lnewsome@umwafunds.org

Stanley F. Lechner
Charles P. Groppee, Esq.
Morgan Lewis & Bockius, LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Telephone:  (202) 739-5681
Email:  charles.grouppee@morganlewis.com

John C. Goodchild, Esq.
Morgan Lewis & Bockius, LLP
1701 Market Street
Philadelphia, PA 19103
Telephone:  (215) 963-5000
Email:  jgoodchild@morganlewis.com

John R. Mooney, Esq.
Paul A. Green, Esq.
Olga M. Thall
Mooney, Green, Saindon, Murphy & Welch, P.C.
1920 L Street, N.W., Suite 400
Washington, D.C.  20036
Telephone:  (202) 783-0010
Email:  jmooney@mooneygreen.com
Email:  pgreen@mooneygreen.com

*Counsel for Plaintiffs/Counterclaim-Defendant-UMWA1992 Benefit Plan*

31391101.1