UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL H. HOLLAND, as Trustee of the
United Mine Workers of America 1992
Benefit Plan, *et al.*,

       *Plaintiffs*,

    v.

ARCH COAL, INC.,

       *Defendant.*

Civil Action No. 17-cv-300 (DLF)

# MEMORANDUM OPINION

The Trustees of the United Mine Workers of America 1992 Benefit Plan (1992 Plan) bring this action under the Employee Retirement Income Security Act of 1974 (ERISA), *as amended*, 29 U.S.C. §§ 1001 *et seq.*, to compel defendant Arch Coal, Inc. to post security pursuant to the Coal Industry Retiree Health Benefit Act of 1992 (Coal Act), *as amended*, 26 U.S.C. §§ 9701 *et seq*. The defendant argues that the Coal Act does not require it to post security and that, in any event, the 1992 Plan already has security from another source in excess of what the Coal Act permits. The defendant counterclaims to recover that excess. Before the Court are the parties' cross-motions for summary judgment on both claims.

## I.    BACKGROUND

### A.    Relevant Statutory Provisions

"The Coal Act was Congress's solution to decades of contentious negotiations between employers in the coal industry and the United Mine Workers of America ('UMWA') regarding the provision of employee benefits to coal miners." *Holland v. Williams Mountain Coal Co.*, No. CIV. A. 96-1405CKKJMF, 2000 WL 284298, at *1 (D.D.C. Feb. 24, 2000), *aff'd*, 256 F.3d 819

(D.C. Cir. 2001).¹ Before the Coal Act, a collection of union agreements called "NBCWAs" required coal operators to provide benefits to their own retirees through Individual Employer Plans and to make contributions to a multiemployer fund that provided benefits to "orphaned" workers whose employers had gone out of business. *Dist. 29, United Mine Workers of Am. v. United Mine Workers of Am. 1992 Ben. Plan*, 179 F.3d 141, 143 (4th Cir. 1999). But when coal operators began exiting the industry—or, in some cases, shifting to non-union workforces—"the number of orphaned retirees rose rapidly," *id.*, and the NBCWAs faced a "serious financial crisis," *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 444 (2002).

In 1992, Congress intervened and passed the Coal Act "amidst a maelstrom of contract negotiations, litigation, strike threats, a Presidential veto[,] . . . threats of a second veto, . . . high pressure lobbying, [and] wide disagreements among Members of Congress." *Id.* at 445–46 (footnotes omitted). The Coal Act "replace[d] the [previous] contract-based system with a comprehensive statutory system." *Holland*, 2000 WL 284298, at *1. And it established "three vehicles for financing retirees' health benefits." *Dist. 29, United Mine Workers of Am.*, 179 F.3d at 143.

First, it created a "Combined Fund" that covers all workers receiving retirement benefits under existing NBCWAs as of July 20, 1992. *Id.* (citing 26 U.S.C. § 9703(f)). Second, it required operators with individual employer plans in place as of February 1, 1993 to continue maintaining those plans until they go out of business. *Id.* (citing § 9711(a)–(b)). Third, it established the "1992 UMWA Benefit Plan" as a "backstop" for anyone not covered by the Combined Fund or an individual employer plan—that is, "those who would have been eligible

---

¹ *See also E. Enters. v. Apfel*, 524 U.S. 498, 519 (1998) (plurality opinion) (discussing history of Coal Act); *R.G. Johnson Co. v. Apfel*, 172 F.3d 890, 892 (D.C. Cir. 1999) (same).

under the Combined Fund but for its cut-off date and those whose employers orphan them by going out of business." *Id.* (citing § 9712(b)); *see also Bellaire Corp. v. Shalala*, 995 F. Supp. 125, 130 (D.D.C. 1997) (describing the 1992 Plan as "a safety net to provide health benefits to people who should receive coverage under an individual employer plan but do not").

This third vehicle—the 1992 Plan—is the subject of this lawsuit, and its Trustees are the plaintiffs in this case. Section 9712(d) of the Coal Act places responsibility "for financing the benefits" of the 1992 Plan on entities called "1988 last signatory operators." § 9712(d). Specifically, these entities must satisfy three "requirements":

- "(A) The payment of a monthly per beneficiary premium[;]
- (B) The provision of a security (in the form of a bond, letter of credit, or cash escrow)[; and]
- (C) [T]he payment of an additional backstop premium [in certain circumstances]."

  § 9712(d)(1)(A)–(C).

Further—and of relevance here—§ 9712 also makes "any related person" to a 1988 last signatory operator "jointly and severally liable with such operator for any amount required to be paid by such operator under this section." § 9712(d)(4).

The first question in this case is whether the joint and several liability imposed on "related person[s]" by § 9712(d)(4) extends to *all three* of the financing requirements set forth in § 9712(d)(1)—including the "provision of security" in subsection (B)—or whether it is limited to the "payment[s]" mentioned in subsections (A) and (C).

The second question is whether the obligation to provide security—assuming such an obligation exists—is satisfied by a letter of credit even after that letter of credit has been drawn down and converted into cash by the 1992 Plan's Trustees.

A final, related question is whether the Coal Act requires the 1992 Plan to use proceeds from a called security for a particular purpose—namely, to provide the benefits secured by that security—or whether the 1992 Plan may treat the proceeds as a general asset subject only to the terms of the security and the general fiduciary duties imposed on Trustees by ERISA.

B.     **Undisputed Facts**[2]

Arch Coal is a "related person" under the Coal Act because, in 1992 (the relevant time period under the Act), it owned several subsidiaries that qualified as "1988 last signatory operators." Def.'s Statement of Facts ¶ 5, Dkt. 20-2. Initially, Arch Coal posted a bond that satisfied § 9712(d)(1)(B)'s security requirement with respect to those subsidiaries. *Id.* ¶ 6.[3] But in 2005, Arch Coal sold the subsidiaries to Magnum Coal Company, and Magnum contractually agreed to replace Arch Coal's security with its own. *Id.* ¶¶ 7–8. In July 2008, Patriot Coal Corporation acquired Magnum's stock and became the subsidiaries' new corporate parent. *Id.* ¶ 9. These transactions did not alter Arch Coal's status as a "related person"—which remained fixed by the Coal Act based on a snapshot of 1992—but they did leave Patriot primarily responsible for securing the subsidiaries' Coal Act obligations, which Patriot did by amending a

---

[2] Except as otherwise noted, the following facts derive from undisputed portions of the statements of facts submitted by the plaintiffs and the defendant. The Court therefore dispenses with parallel citations to the parties' responses.

[3] The Trustees claim that Arch Coal posted this security to fulfill its *own* obligation as a related person, but the defendant insists it did so voluntarily to fulfill its *subsidiaries'* obligation as 1988 signatories. *Compare* Pls.' Resp. to Def.'s Statement of Facts ¶ 6, Dkt. 21-1, *and* Pls.' Reply at 2, Dkt. 24 (asserting that "Arch posted security pursuant to Section 9712(d)(1)(B) *as a related person* for nearly a decade"), *with* Def.'s Statement of Facts ¶ 6, *and* Def.'s Reply at 3 n.2 ("Arch's prior history [of posting security] is consistent with the reality that corporate parents typically are in the best position to provide for surety bonds and letters of credit for their wholly owned subsidiaries. Thus, Arch would have arranged for the required bond/letter of credit for its subsidiaries whether voluntary or mandatory, so long as there existed unified ownership."). This dispute is immaterial, however, because the fact that Arch Coal may have subjectively believed it was required to post security in the past has no bearing on the statute's objective meaning.

letter of credit with Fifth Third Bank. *Id.* ¶ 9–10. The resulting letter of credit was issued "in favor of" the 1992 Plan, as sole beneficiary, and "for the account of Patriot Coal Corporation." Pls.' Statement of Facts ¶¶ 26–27, Dkt. 19 (quoting Pls.' Mot. for Summ. J. Ex. D., Dkt. 19-2). Arch Coal was not a party to the letter of credit at any time. *Id.* ¶¶ 28–29. The terms of the letter of credit allowed the 1992 Plan to draw on the letter of credit upon either Patriot's "failure, refusal or cessation to provide benefits" or "the 1992 Plan's enrollment" of retirees "attributable to" Patriot. *Id.* ¶ 35 (quoting Pls.' Mot. for Summ. J. Ex. D.).

On May 12, 2015, Patriot and the subsidiaries it had acquired from Magnum (and ultimately from Arch Coal) filed for bankruptcy. Def.'s Statement of Facts ¶ 11. As a result of that bankruptcy, the subsidiaries' Coal Act obligations were terminated in October 2015. *Id.* ¶ 12.[4] Shortly thereafter, Arch Coal notified the 1992 Plan that, as a "related person," it would begin providing benefits to its former subsidiaries' qualifying retirees. *Id.* ¶ 13. Arch Coal implemented a benefit plan as promised on November 1, 2015. *Id.* ¶ 14. Since then, Arch Coal has paid the monthly premiums that § 9612(d)(1)(A) requires and that were previously paid by the subsidiaries. *Id.* ¶ 18.

The 1992 Plan drew down Patriot's $8,608,392 letter of credit on December 10, 2015 and received a $8,608,392 wire transfer from Fifth Third Bank on December 18, 2015. *Id.* ¶¶ 19–20; *see also* Pls.' Statement of Facts ¶¶ 39–40. The 1992 Plan considers those proceeds a general asset and has "not segregated" the funds "into separate accounts for separate beneficiaries or for

---

[4] The parties dispute the precise manner in which these obligations were terminated, *compare* Def.'s Statement of Facts ¶ 12 (the "bankruptcy court terminated" the obligations), *with* Pls.' Resp. to Def.'s Statement of Facts ¶ 12 (the bankruptcy court approved a sale, and that sale caused the subsidiaries to cease being "in business" for purposes of the Coal Act), but the difference is immaterial for purposes of this suit.

groups of beneficiaries attributable to particular operators." Pls.' Resp. to Def.'s Statement of Facts ¶ 23.

On March 16, 2016, the 1992 Plan informed Arch Coal that it had not provided security and asked it to do so. Pls.' Statement of Facts ¶ 46. Almost a year later, in February 2017, the 1992 Plan wrote Arch Coal again, asserting that Arch Coal had a "statutory obligation" to provide security and requesting that Arch Coal provide security immediately. *Id.* ¶ 47 (quoting Pls.' Mot. for Summ. J. Ex. M., Dkt. 19-17). Arch Coal declined to provide the demanded security and took the position that Patriot's letter of credit satisfied any security obligation on the part of Arch Coal. *Id.* ¶¶ 49–52. Arch Coal acknowledged that "Arch [Coal] and its related persons are required to provide the 1992 Plan with security in the amount of $8,160,720" but argued that the $8,608,392 drawn from Patriot's letter of credit served as a "cash escrow" that rendered Arch Coal "over-secured in the amount of $447,672." *Id.* ¶ 51 (quoting Pls.' Mot. for Summ. J. Ex. E., Dkt. 19-9).

The Trustees filed this suit on February 16, 2017 seeking to compel Arch Coal to post security. Dkt. 1. Arch Coal answered and counterclaimed on March 21, 2017 seeking the return of what it characterizes as excess security. Dkt. 4. The Trustees answered the counterclaim on April 10, 2017. Dkt. 7. This case was reassigned to the undersigned on December 5, 2017. Before the Court are the parties' cross-motions for Summary Judgment on both the plaintiffs' claim and the defendant's counterclaim. Dkts. 19, 20.

## II. LEGAL STANDARD

A court grants summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A

"material" fact is one with potential to change the substantive outcome of the litigation. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895. "If there are no genuine issues of material fact, the moving party is entitled to judgment as a matter of law if the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Holcomb*, 433 F.3d at 895 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## III. ANALYSIS

This case raises three purely legal questions of first impression: first, whether Arch Coal's status as a "related entity" makes it "jointly and severally liable" for providing the security required by § 9712(d)(1)(B); second, whether that liability was discharged by Patriot's letter of credit even though it has since been drawn down and converted into cash by the Trustees; and third, whether the Coal Act limits the uses to which the proceeds from a called security can be put. The parties agree about the relevant facts but offer competing interpretations of the same statutory provisions.

"As in all statutory construction cases," the Court must "begin with the language of the statute." *Sigmon Coal Co.*, 534 U.S. at 450 (construing Coal Act). "The first step is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case," and "[t]he inquiry ceases if the statutory language is unambiguous and the statutory scheme is coherent and consistent." *Id.* (internal quotation marks omitted).

When interpreting the Coal Act specifically, courts must keep in mind that "delicate crafting reflected a compromise amidst highly interested parties attempting to pull the provisions

7

in different directions" and that "a change in any individual provision could have unraveled the whole." *Id.* at 461. It is not the Court's role "to judge or second-guess" the "deals brokered" during this contentious process but rather to "interpret the language of the statute enacted." *Id.* "Where the statutory language is clear and unambiguous," the Court "need neither accept nor reject a particular 'plausible' explanation for why Congress would have written [the Coal Act]" the way it did. *Id.* at 460. It need only apply the Coal Act as written.

## A. Whether the Joint and Several Liability Imposed on "Related Persons" in § 9712(d)(4) Extends to the Provision of Security Required by § 9712(d)(1)(B).

Section 9712(d)(4) makes "any related person to any [1988 last signatory] operator . . . jointly and severally liable . . . for *any amount required to be paid* by such operator under this section." § 9712(d)(4) (emphasis added).

The defendant argues that § 9712(d)(4)'s focus on *payments* should be understood to limit joint and several liability to the premiums required by § 9712(d)(1)(A) and § 9712(d)(1)(C) and to exclude the provision of security required by § 9712(d)(1)(B). But that interpretation is inconsistent with the statute's plain text and structure.

Beginning with the text, the phrase "any amount required to be paid" is not defined in the Coal Act and thus takes on its ordinary meaning. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning."). As the plaintiffs point out, the term "payment" is often used to describe the provision of security. *See, e.g.*, *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 425 n.16 (3d Cir. 2013) (referring to "security" as a "form[] of payment"); *In re Montgomery Ward, LLC*, 292 B.R. 49, 54 (Bankr. D. Del. 2003) (describing a "letter of credit" as "a mode of payment"). The defendant disputes this plain meaning, citing Black's Law Dictionary as evidence. *See* Def.'s Reply at 13, Dkt. 25 (citing Black's Law Dictionary 1129 (6th ed. 1990) (attached to

8

Def.'s Reply as Ex. 1, Dkt. 25-1)). But the first sentence of the cited definition defines "payment" broadly as "[t]he fulfillment of a promise, or the performance of an agreement," and the definition goes on to make repeated references to "money *or its equivalent*." Def.'s Reply Ex. 1 (emphasis added). Thus, even the defendant's proffered definition is more than capacious enough to encompass the provision of security. Security, at minimum, enables a conditional payment to the beneficiary. And it often involves a payment to someone else in the interim— whether a surety, a bank, an escrow agent, or some other entity. Section 9712(d)(4)'s joint and several liability is not limited to payments made *to the 1992 Plan* but extends to all payments required to be paid *by 1988 last signatory operators*. *See* § 9712(d)(4). Thus, the fact that providing security may involve payments to third parties for the benefit of the 1992 Plan—rather than to the 1992 Plan itself—does not mean those payments are not "required to be paid . . . under this section." *Id.*

Moving to statutory structure, the same subsection that creates joint and several liability for "any amount required to be paid" refers to the narrower concept of "premiums" in the very next sentence. *See* § 9712(d)(4). This shows that Congress knows how to identify premiums when it wants to. But instead of limiting joint and several liability to "premiums," Congress established joint and several liability for "any amount required to be paid" under § 9712. *See Burlington N. & Santa Fe. Ry. v. White*, 548 U.S. 53, 63 (2006) ("We normally presume that, where words differ as they differ here, Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks omitted)); *see also Sigmon Coal Co.*, 534 U.S. at 452–54 (finding slight variations between Coal Act provisions intentional and refusing to "ascribe th[e] difference to a simple mistake in draftsmanship" (intentional quotation marks omitted)). This difference is especially revealing considering that elsewhere in the Coal Act

Congress *did* limit related persons' joint and several liability to premiums, and it did so explicitly. In outlining the financing requirements for the Combined Fund—another fund created by the Act—Congress made "related person[s] . . . jointly and severally liable for any *premium* required to be paid." § 9704(a) (emphasis added). The use of the word "premium" in § 9704 reflects the fact that, unlike in § 9712, the *only* financial obligation imposed in that section is the obligation to pay premiums; there is no obligation to post security. Hence, in a section requiring operators to pay premiums, Congress made related persons jointly and severally liable to pay "premium[s];" and in a parallel section requiring operators to pay premiums *and to provide security*, Congress made related persons jointly and severally liable to pay "amount[s]." § 9712(d)(4). The natural implication of this difference is that Congress used the broader term "amount" in § 9712(d) precisely to include the provision of security required under that section.

Moreover, the obligation to provide security in § 9712(d)(1)(B) "must be read in [its] context and with a view to [its] place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). The obligation is listed between the premiums in § 9712(d)(1)(A) and § 9712(d)(1)(C) as one of three "financing" requirements imposed on 1988 last signatory operators. *See* § 9712(d)(1)(A)–(C). If Congress wanted to identify only two out of three of those financing obligations, it would be strange to do so through a cryptic reference to "amount[s] . . . paid" when it could have done so explicitly by using the term "premium" or simply cross-referencing the two subsections it had in mind. Naturally read, the phrase "any amount required to be paid under this section" thus refers to all three "financing" requirements, including the provision of security.

The defendant counters that it "makes perfect sense" to obligate 1988 last signatories, but not their related persons, to provide security. Def.'s Mot. for Summ. J. at 12. In the defendant's view, when a 1988 last signatory operator fails to meet its Coal Act obligations, its related persons serve as the "first backstop." *See id.* at 13. But because some 1988 last signatory operators do not have any related persons, Congress devised the security requirement to cushion the blow in the event a "standalone operator[]" goes out of business. *Id.* at 12. The defendant argues that it would be "surplusage" to require both a 1988 last signatory operator *and* its related person to post security, because the security requirement was designed for scenarios in which no related person exists and because ordinarily the security arranged by the 1988 last signatory operator will remain available even after a related person assumes responsibility over premiums. *See id.* at 13. But what the defendant considers "surplusage," Congress may well have considered belt and suspenders. And, in any event, the Court "need neither accept nor reject a particular 'plausible' explanation for why Congress would have written [the Coal Act]" the way it did. *Sigmon Coal Co.*, 534 U.S. at 450. The Court agrees with the plaintiffs that the plain text and structure of § 9712(d)(1) and § 9712(d)(4) unambiguously hold related persons jointly and severally liable for the obligation to provide security under § 9712(d)(1)(B). The defendant must therefore provide security compliant with that provision.

### B. Whether Cash Proceeds from a Letter of Credit Qualify as the "Provision of Security" Under § 9712(d)(1)(B).

The defendant argues that, even if it is obligated to provide security, that obligation was fulfilled by Patriot's letter of credit, which has now been drawn down and converted into cash by the Trustees. *See* Def.'s Mot. for Summ. J. at 21. But § 9712(d)(1)(B) requires security to be provided in one of three specific "form[s]": "a bond, letter of credit, or cash escrow." § 9712(d)(1)(B). Patriot's letter of credit is no longer in place, *see* Pls.' Statement of Facts

11

¶¶ 39–40; *see also* Def.'s Opp'n at 10 (acknowledging that "it is true that the letter of credit is gone"), and the defendant does not claim to have replaced it with a bond, a new letter of credit, or a cash escrow account.

To be sure, the letter of credit is only gone because it was converted to cash. But even if, as a practical matter, "[t]he proceeds from the letter of credit provide the Plan no less security than the letter of credit itself," *id.*, the plain text of § 9712 does not allow for "as-good" or "even-better" security; it requires security in one of three exclusive forms. Because the defendant has not arranged for the provision of security in any of those forms, it has not met its obligation under § 9712(d)(1)(B).

### C. Whether the Coal Act Requires the 1992 Plan to Use the Cash Proceeds from a Called Security to Provide the Benefits Secured by that Security.

According to the defendant, the inquiry cannot end here because § 9712(d)(1)(B) also limits the uses to which proceeds from a called security may be put. Specifically, the defendant argues that the proceeds must be used for the sole purpose of "defray[ing] the cost of providing health benefits for the beneficiaries of a 1988 last signatory operator, should that ever become necessary." Def.'s Mot. for Summ. J. at 20. Thus, in the defendant's view, the funds drawn from Patriot's letter of credit must be used in one of three ways. First—and preferred by Arch Coal—the funds could be placed in a Coal Act–compliant cash escrow account to secure Arch Coal's Coal Act obligations moving forward. *Id.* at 23. Failing that, the 1992 Plan must use the funds either to provide the benefits Arch Coal has assumed responsibility for (until the funds are exhausted) or to reimburse Arch Coal for providing those benefits. *Id.* at 22.

The defendant roots these proposed limitations in the text of § 9712(d)(1)(B), which provides that the security must be "in an amount equal to a portion of the projected future cost to the [1992 Plan] of *providing health benefits for eligible and potentially eligible beneficiaries*

*attributable to the 1988 last signatory operator*" for whom the related person is liable. Def.'s Reply at 3–4 (quoting § 9712(d)(1)(B)) (emphasis added in original). But that language merely determines the amount of security required and, at most, reveals the purpose behind that requirement. It does not, by its terms, set limits on the 1992 Plan's ability to call a security, or to use the proceeds it receives as a result. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 261 (1993) ("[V]ague notions of a statute's 'basic purpose' are . . . inadequate to overcome the words of its text," particularly when interpreting "an enormously complex and detailed statute that resolved innumerable disputes between powerful competing interests.").

To the extent such limits exist, they derive from the documents governing the security and from the fiduciary obligations ERISA imposes on the plaintiffs as Trustees of "an employee welfare benefit plan" and "a multiemployer plan." 26 U.S.C. § 9712(a)(2)(B)–(C). But the defendant does not challenge the 1992 Plan's right—or decision—to draw funds under the letter of credit. *See* Def.'s Opp'n at 10 ("Arch Coal does not challenge the letter of credit drawdown."); *see also* Pls.' Reply at 7–8 (arguing that Arch Coal would lack standing to challenge the drawdown). And ERISA requires only that the Trustees act "solely in the interest of the participants and beneficiaries" of the 1992 Plan and "for the exclusive purpose" of "providing benefits to participants" and "defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). It does not impose any sourcing and tracing requirements of the kind requested by the defendant. Indeed, ERISA *prohibits* the Trustees from allowing the "assets of a plan" to "inure to the benefit of any employer" and requires that they "be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1). Thus, if

13

anything, the text of ERISA precludes the Trustees from using the funds to offset Arch Coal's obligations as an employer.

The Court is sympathetic to Arch Coal's plight. After all, the 1992 Plan received over $8 million without incurring any corresponding loss or obligation. And now Arch Coal must fund the same commitments the $8 million was designed to secure. But to the extent the 1992 Plan has received a windfall, that windfall is due to the terms of Patriot's letter of credit, not the Coal Act. Had the 1992 Plan's right to draw funds been conditioned upon the 1992 Plan incurring the cost of providing benefits—as opposed to Patriot's failure to provide them—then the letter of credit presumably would have either remained in effect or been terminated without payment in a manner that left no room for doubt about Arch Coal's obligation to replace it. But instead, the letter of credit allowed the 1992 Plan to draw funds when *Patriot* ceased to provide benefits, even though those same benefits would subsequently be provided without interruption by Arch Coal. Although the defendant characterizes this result as "seeking refuge in the law of commercial paper," Def.'s Opp'n at 9, the Court views it as the natural consequence of the letter of credit's terms, which the defendant does not challenge. The Court therefore denies the defendant's requests to require the Trustees to place the funds in a cash escrow account, *id.* at 6–7, or to impose a constructive trust on the proceeds, *id.* at 8–9, and will allow the letter of credit—and the Coal Act—to apply as written.

In sum, the Court finds that Arch Coal is required to provide security pursuant to § 9712(d)(1)(B), that it has not yet done so in one of the statutorily authorized forms, and that the Coal Act does not require the Trustees to place the proceeds of Patriot's letter of credit in a cash escrow account or to use them to fund the benefits owed by the defendant as a related person. Consequently, the Court also finds that the 1992 Plan is not over-secured. The Court will

14

therefore grant summary judgment in favor of the plaintiffs on both the plaintiffs' claim and the defendant's counterclaim.[5]

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the plaintiffs' Motion for Summary Judgment and denies the defendant's Motion for Summary Judgment. A separate order accompanies this memorandum opinion.

*[signature]*
DABNEY L. FRIEDRICH
United States District Judge

Date: September 28, 2018

---

[5] The Court in its discretion declines to award attorneys' fees pursuant to 29 U.S.C. § 1132(g)(1). Although the plaintiffs request mandatory attorneys' fees under § 1132(g)(2), Compl. at 5, they have not offered any argument in support of that request or explained why their action to compel the provision of security would qualify as an action "to enforce section 1145," which concerns only "contributions." *See* §§ 1132(g)(2), 1145. The Court will therefore deny that request.